772 F.2d 1078
 Anthony GEORGEVICH, on his own Behalf and on Behalf of the
class he represents, Appellant,
v.
Judge Samuel STRAUSS, Leroy S. Zimmerman, Attorney General,
of the Commonwealth of Pennsylvania, Intervenor.
 No. 84-5194.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 12, 1984.
Argued In Banc May 6, 1985.
Decided Sept. 5, 1985.
Rehearing and Rehearing In Banc Denied Sept. 30, 1985.
 
 Richard G. Fishman (argued), Keystone Legal Services, Inc., State College, Pa., for appellant.
 Howland W. Abramson (argued), Charles W. Johns, Admin. Office of Pa. Courts, Philadelphia, Pa., for appellees.
 Allen C. Warshaw (argued), Andrew S. Gordon, Office of Atty. Gen., Harrisburg, Pa., for intervenor.
 Before ADAMS, HIGGINBOTHAM, and SLOVITER, Circuit Judges.
 Argued In Banc May 6, 1985
 Before ALDISERT, Chief Judge, SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, and MANSMANN, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This is an equal protection challenge to parole procedures governing certain Pennsylvania state prisoners. The plaintiff class consists of inmates serving less than two year sentences in state institutions. They claim that they have not been afforded parole procedures granted by state statute to similarly situated prisoners serving less than two year sentences in county prisons. Counsel for the defendant class of Pennsylvania Common Pleas judges essentially agrees that plaintiffs are entitled to the parole procedures they seek to obtain here by federal constitutional attack, but it is the position of the defendant class that these procedures are established by state law, and that under the circumstances here federal judicial oversight is unnecessary. We conclude that whether state law affords the plaintiffs the relief they seek is at least an "unsettled question of state law, the resolution of which would affect the decision of a federal constitutional issue," Heritage Farms, Inc. v. Solebury Township, 671 F.2d 743, 746 (3d Cir.), cert. denied, 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982), and that therefore abstention is required under the doctrine of Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed.2d 971 (1941).
 
 
 2
 The extent of the parties' agreement as to the ultimate issue in the case--whether prisoners serving similar sentences in county and state prisons are entitled to similar parole procedures--is reflected in the fact that the parties initially agreed to a consent decree providing for such procedures. The fate of that decree, however, also demonstrates quite dramatically that the real issue in dispute here concerns federal-state comity, and not prisoner rights. When notice of the proposed settlement was sent out, the principal objections received focused on the issue of the propriety of unnecessary federal jurisdiction over more than 300 state court judges.
 
 
 3
 The district judge, who had tentatively approved the consent decree, subsequently revoked his approval, and eventually granted defendants summary judgment on the ground that comity required that plaintiffs exhaust their state remedies before seeking federal jurisdiction. While we do not agree with the judge's holding regarding exhaustion, we conclude that his comity concerns were appropriate, and that they properly support Pullman abstention. Accordingly, the district court's judgment will be vacated, and the case remanded so that the district court can retain jurisdiction but abstain from resolution of the state law issue until the state judiciary has been afforded a fair opportunity to do so.
 
 I.
 
 4
 Parole for Pennsylvania state prisoners is governed by a legislative scheme consisting of three statutes. The first, 61 Pa.Stat.Ann. Sec. 331.22 (Purdon Supp.1984-85), establishes parole procedures for the Pennsylvania Board of Probation and Parole, which is authorized to parole prisoners who have received sentences greater than two years.[1] The second, 61 Pa.Stat.Ann. Sec. 331.26 (Purdon 1964), authorizes sentencing judges to parole all prisoners serving less than two years, but sets up no procedures.[2] Finally, 61 Pa.Stat.Ann. Sec. 314 (Purdon 1964) creates parole procedures for prisoners serving sentences of less than two years in county institutions.[3] When the current parole arrangement was created, in 1941, it was intended to and did in fact provide procedures for all possible parole situations, for prisoners sentenced to less than two years were confined exclusively to county institutions.[4]
 
 
 5
 In 1974, however, in response to county jail overcrowding, the legislature passed 42 Pa. Cons.Stat.Ann. Sec. 9762(3) (Purdon 1982). That statute authorized the governor to transfer prisoners serving less than two years from the county jail in which they ordinarily would be incarcerated to state correctional facilities. Members of the plaintiff class fall within this category of transferred prisoners; their parole is still in the hands of their sentencing judges, but technically they appear not to be covered by the 1941 parole procedures.
 
 
 6
 Plaintiff, Anthony Georgevich, instituted this class action under 42 U.S.C. Sec. 1983 (1982), claiming that inmates serving less than two year sentences in state facilities are denied equal protection because they are not given the same due process protections as inmates in county facilities or those who are under the Board's authority.[5] The named defendant was Judge Samuel Strauss, Georgevich's sentencing judge, and suit was filed against a class of similarly positioned Pennsylvania judges.
 
 
 7
 The case was listed for trial on the June 1982 trial list. Shortly thereafter, the parties submitted a proposed consent decree, which provided, in essence, that sentencing courts would hold hearings on parole decisions for prisoners in state institutions (as it must do for prisoners in county institutions) and would give each prisoner denied parole a written statement of the reasons for the action (as the Board must provide to prisoners within its jurisdiction).[6] The court tentatively approved the consent decree, and notice of the proposed settlement was sent to members of both classes.
 
 
 8
 In response to this notice, four objections were filed on behalf of thirteen members of the defendant class: (1) Six judges from Bucks County objected, stating that it was not appropriate for a state court judge to be subject to the contempt powers of a single federal judge; that they did not consent to representation by defense counsel (who is legal counsel to the administrator of Pennsylvania Courts); that the issues were not proper for resolution by a class action consent decree; that the Pennsylvania legislature and courts were competent to deal with the issues; and that the exercise of federal jurisdiction over more than 300 state court judges was an unwarranted intrusion upon the state judiciary, App. at 58-60; (2) Three judges of Lycoming County proposed that the decree be modified to permit hearings to be held before hearing officers appointed by the sentencing judge, App. at 54-55; (3) A Beaver County judge objected, primarily to the requirement that the sentencing judge hold hearings "at or before the inmate's minimum release date," and stated that he did not assent to being bound by the consent decree if it was approved, App. at 61-62; and (4) Three other judges (who did not identify their county) objected on the grounds that the proposed consent decree exceeded the statutory requirements by adding a provision for a written statement of reasons for denial at or before the minimum release date, and complained that the courts would be inundated with petitions and hearings, effectively creating a substantive right to parole, App. at 63-64.
 
 
 9
 Troubled particularly by the federal-state comity objections, the district court directed the parties to file additional briefs on the issues of comity, the status of the judicial defendants as proper parties, and the appropriateness of bringing the action pursuant to 42 U.S.C. Sec. 1983. At that point, counsel for the defendant class changed position and urged the court not to approve the consent decree, because of the federal-state problems that had become apparent. Thereafter, the district court declined to approve the consent decree. Georgevich v. Strauss, 96 F.R.D. 192, 196 (M.D.Pa.1982).
 
 
 10
 Cross-motions for summary judgment were subsequently filed, and the district court granted defendants' motion. The district court held that although plaintiffs challenged the manner in which parole decisions are made, they sought "habeas corpus type relief" and therefore they were first required to exhaust their state court remedies. This appeal followed.
 
 II.
 
 11
 Plaintiffs argue that the district court erred in refusing to give final approval to the consent decree. Since resolution of this issue in plaintiffs' favor would terminate the appeal, we address it first. Plaintiffs contend that the defendant class waived its right to argue against approval of the consent decree because it initially requested the court to approve the proposed settlement. This is not a case, however, where the class representative or his counsel merely changed his mind. See e.g., Tate v. Werner, 68 F.R.D. 513, 519, 521-22 (E.D.Pa.1975). Here, the court directed briefing on issues that counsel for the class may not have sufficiently considered before. The shift in position by the class representative and his counsel apparently came about as a result of the issues raised by the court. Under these circumstances, we reject plaintiffs' claim of waiver.
 
 
 12
 Moreover, even if both parties had continued to support the consent decree, the district court retained the authority to disapprove of the settlement. See Fed.R.Civ.P. 23(e). Before a court approves a class action settlement, it must determine that the settlement is fair, adequate, and reasonable. See Grunin v. International House of Pancakes, 513 F.2d 114, 118 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); City of Detroit v. Grinnell Corp., 495 F.2d 448, 455-56, 462 (2d Cir.1974). "The district court has considerable discretion in determining whether a settlement is fair and reasonable, and its determination will be reviewed only for abuse of discretion." Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 801 (3d Cir.), cert. denied, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). See Moore v. City of San Jose, 615 F.2d 1265, 1271 (9th Cir.1980); Lowenschuss v. C.G. Bluhdorn, 613 F.2d 18, 19 (2d Cir.) (per curiam), cert. denied, 449 U.S. 840, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980); Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir.1975). See generally 3 H. Newberg, Newberg on Class Actions Sec. 5690 (1978 & 1984 Supp.).
 
 
 13
 In light of the objections raised by some members of the defendant class, the court's legitimate concerns about federal-state relations, and the changed position of the defendant class representative, we cannot say that the district court abused its discretion in declining to approve the consent decree.
 
 III.
 
 14
 Because we conclude that approval of the consent decree was properly revoked, we must consider the propriety of the district court's grant of summary judgment. Plaintiffs contend on appeal that the court erred by requiring exhaustion of state remedies in a Sec. 1983 action. Defendants urge affirmance of the district court's decision on three separate grounds: (1) exhaustion should be required because plaintiffs' suit is more properly characterized as a habeas corpus petition than a Sec. 1983 action; (2) state judges are not proper parties; and (3) dismissal is appropriate under the Pullman abstention doctrine. We will address these issues in turn.
 
 A.
 
 15
 The judicially imposed requirement that state prisoners exhaust available state remedies before they may seek a writ of habeas corpus in federal court, see, e.g., Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), has now been codified in 28 U.S.C. Sec. 2254(b) and (c) (1982). Equally firm is the principle that litigants who properly seek redress in federal court under 42 U.S.C. Sec. 1983 (1982) are not required to exhaust state judicial or administrative remedies. See Patsy v. Board of Regents, 457 U.S. 496, 500-16, 102 S.Ct. 2557, 2559-68, 73 L.Ed.2d 172 (1982). Thus, when a state prisoner invokes Sec. 1983, analysis of the relief sought is necessary to determine whether exhaustion of state remedies is required.
 
 
 16
 The Supreme Court addressed the question of the interrelationship between 42 U.S.C. Sec. 1983 and 28 U.S.C. Sec. 2254 in Preiser v. Rodriguez, 411 U.S. 475 (1973). In Preiser the Court held that a constitutional challenge by state prisoner plaintiffs to the cancellation of their good-behavior-time credits should have been brought in a habeas corpus action, notwithstanding the fact that plaintiffs' claim came within the literal terms of Sec. 1983. The Court enunciated the following rule to determine which action is appropriate:
 
 
 17
 [W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus.
 
 
 18
 Id. at 500, 93 S.Ct. at 1841.
 
 
 19
 The Court has been careful to distinguish cases seeking release, which must be brought by writ of habeas corpus, from those challenging procedures, which may go forward under Sec. 1983. Thus, in Wolff v. McDonnell, 418 U.S. 539, 554-55, 94 S.Ct. 2963, 2973-74, 41 L.Ed.2d 935 (1974), the Court held that although an action seeking restoration of good time credits could be brought only as a petition for habeas corpus, a litigant could sue for damages and an injunction under Sec. 1983 based on a claim that good time credits were lost without proper procedural protections. In Gerstein v. Pugh, 420 U.S. 103, 107 n. 6, 95 S.Ct. 854, 859 n. 6, 43 L.Ed.2d 54 (1975), the Court noted that where the relief sought was a hearing, not release from confinement, the action need not be brought as a habeas corpus petition. Cf. Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (Sec. 1983 action raising the issue of whether the due process clause applied to parole-release determinations addressed on the merits without requiring exhaustion).
 
 
 20
 Relying on Preiser, the district court here concluded that plaintiffs sought "habeas corpus type relief" and, therefore, were required to exhaust their state remedies prior to proceeding in federal court. Plaintiffs argue that Preiser is not applicable because they do not seek release from confinement, only an equalization of the procedures used for making parole decisions. They assert that their challenge is only to the process, not to the results of any parole determination.
 
 
 21
 In Wright v. Cuyler, 624 F.2d 455 (3d Cir.1980), this court considered an issue analogous to that presented here: whether a prisoner who alleged that he was denied due process because his application for home furlough was arbitrarily and capriciously denied was required to exhaust state remedies. We held that he was not. We stated that "Preiser involved a program that would enable the prisoner to be granted early parole and to be released from prison before the end of his sentence," id. at 457, whereas the challenge to the operation of the home furlough program was directed to the conditions of confinement. We explained the distinction as follows:
 
 
 22
 Wright's demand for fair application of the furlough eligibility criteria, as distinct from his demand for admission to the program, relates to the manner by which the prison authorities reach their decision and not the outcome of their decision. Thus, this particular claim of Wright's unmistakably goes not to the fact or duration of confinement but rather to the fairness of the decisionmaking process. Although impartial application of the furlough criteria to Wright might increase his chance to gain admission to the furlough program, injunctive relief ordering impartial application would not intrude upon or divest the prison administration of its ultimate discretion to grant or deny Wright's admission to the program. The Preiser rule is therefore in any event inapplicable.
 
 Id. at 458 n. 5 (emphasis in original).[7]
 
 23
 The district court acknowledged that Georgevich did not challenge the outcome of any parole decisions already made, but instead sought declaratory and injunctive relief to challenge the manner in which decisions were made. The court nonetheless declined to make the "fine" distinction between the two types of challenges, finding that plaintiffs' action was "obviously directed towards enhancement of their chances of eventually securing release from imprisonment." App. at 110. As we pointed out in Wright v. Cuyler, however, the fact that a prisoner's success in the litigation might increase the chance for early release does not, in itself, transform the action into one for habeas corpus. Georgevich does not ask for release on parole, but merely seeks uniform application of due process procedures to all members of the class.
 
 
 24
 We conclude that the district court erred in construing the relief sought by plaintiffs as habeas corpus relief with its attendant exhaustion requirement. The court did not make the distinction between process-based claims and those focusing on the outcome of a particular decision. Since plaintiffs' claim relates only to process and not to the actual duration of confinement, we hold that it could properly be brought as a Sec. 1983 action.[8]
 
 B.
 
 25
 Defendants suggest that the district court's dismissal is independently justified on the ground that the judicial class is not a proper party. They contend that there is no case or controversy, for they have no personal interest in the outcome of this litigation that is sufficiently adverse to plaintiffs' position. Defendants maintain that as judges, they are not responsible for the constitutional deprivations complained of, nor are they able to implement, in their official capacities, the relief requested. They proffer instead as the proper party defendant the Attorney General of Pennsylvania, who they claim has the duty to uphold the constitutionality of a challenged statute.[9]
 
 
 26
 The judges' challenge to their status as party defendants appears to misconceive the basis on which the present suit rests. This is not a case in which judges are sued in their judicial capacity as neutral adjudicators of disputes. See, e.g., In re Justices of the Supreme Court of Puerto Rico, 695 F.2d 17, 21-25 (1st Cir.1982). Rather, the judges are sued as enforcers of the statutes, in other words as administrators of the parole power. Defendants could not successfully contend that a suit against the Board challenging the manner in which parole decisions are made would not present a justiciable dispute. See, e.g., Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); Walker v. Prisoner Review Board, 694 F.2d 499 (7th Cir.1982). The Pennsylvania statutory arrangement divides the authority to make parole decisions between the sentencing judges and the Board. We find no basis for distinguishing the role of the sentencing judges from that of the Board; therefore, there is no reason why the Board, but not the judges, may be sued on a similar challenge. Where a suit challenges "statutes related to the judicial process or statutes previously enforced by the particular judge against the plaintiff," judges are proper parties. In re Justices, 695 F.2d at 23.[10]
 
 
 27
 Several decisions of the Supreme Court should set to rest any concerns about the propriety of suing state judges in federal court. In Supreme Court of Virginia v. Consumers Union, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), a Sec. 1983 suit was brought against the Supreme Court of Virginia and its Chief Justice challenging the Court's disciplinary rules governing the conduct of attorneys. The Virginia defendants claimed both legislative and judicial immunity. The Supreme Court distinguished between the judges' legislative, adjudicative and enforcement functions. It held that although the state court and its Chief Justice were immune for the promulgation of the State Bar Code, which was a legislative function, id. at 731-34, 100 S.Ct. at 1974-75, they were proper defendants in a suit for declaratory and injunctive relief as to their role in the institution and enforcement of disciplinary proceedings. Id. at 736-37, 100 S.Ct. at 1977.
 
 
 28
 Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), is even more analagous to this case since plaintiffs there employed a suit against state judges as the vehicle to enforce their procedural due process rights. Plaintiffs, Florida arrestees who complained about the failure to accord them preliminary probable cause hearings, filed a class action against justices of the peace and judges of small-claims court, as well as against certain law enforcement officers. 420 U.S. at 107 & n. 8, 95 S.Ct. at 859 & n. 8. Plaintiffs' demand in that case was similar to that presented here, i.e., implementation of due process procedures in state judicial proceedings.
 
 
 29
 More recently, in Pulliam v. Allen, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), the Supreme Court reaffirmed the principle announced in Ex parte Virginia, 100 U.S. (10 Otto) 339, 25 L.Ed. 676 (1879), that Sec. 1983 was intended to apply to all state actors whether they be executive, legislative or judicial. Pulliam, 104 S.Ct. at 1980-81. The Court held that while there is a "need for restraint by federal courts called on to enjoin the actions of state judicial officers," id. at 1980, judicial immunity is not a bar to injunctive relief against a state judge under Sec. 1983. That case and holding are dispositive of the district court's concern with the character of the defendant class.
 
 
 30
 We also find unpersuasive the argument of the defendant judges that they do not have the institutional authority to grant plaintiffs the relief they seek. As the Attorney General points out, he has no authority to require the judges to hold a hearing on parole, so that a decree against him would be totally ineffective. Plaintiffs are merely seeking to have state court judges follow certain due process procedures, which some of the members of the class already voluntarily follow, and which state statutes clearly provide for other inmates. This does not require the legislature to amend the statutes since there seems to be no reason why the state judiciary would not have power to effectuate plaintiffs' request by promulgation of a rule or issuance of an order.
 
 
 31
 The district court's award of summary judgment, therefore, may not be justified on the ground that the state judges are not proper parties in a suit which challenges their actions as administrators of the parole statutes in question.
 
 C.
 
 32
 While the district judge erred in granting defendants summary judgment, the comity concerns that motivated him inform resolution of the final issue in the case, i.e., the propriety of Pullman abstention. We are faced here with a federal lawsuit against a defendant class of over three hundred state judges, in which counsel for the defendant class essentially agrees that plaintiffs are entitled--under existing state law--to the precise parole procedures that plaintiffs seek to obtain by federal constitutional attack. This would appear to be a paradigmatic case for Pullman abstention; given the position of the defendant class representative on the existing state law, it is almost certain that resolution of the state law issue will obviate the need for a federal court to decide a constitutional issue.[11] Abstention in this matter would demonstrate proper respect for Pennsylvania's common pleas courts by declining to compel them to take action that they have indicated they will take anyway. Federal judicial action at this point seems both unnecessary and improvident.
 
 
 33
 Pullman abstention is appropriate whenever "there is an unsettled question of state law, the resolution of which would affect the decision of a federal constitutional issue, either by obviating the need to decide it or by changing the light in which it must be viewed." Heritage Farms, Inc. v. Solebury Township, 671 F.2d 743, 746 (3d Cir.), cert. denied, 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982) (citing Pullman ). The Pullman doctrine serves two salutary purposes: it avoids "unnecessary adjudication of federal questions and 'needless friction with state policies.' " Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984) (quoting Pullman, 312 U.S. at 500, 61 S.Ct. at 645).
 
 
 34
 Plaintiffs maintain that this case is unfit for Pullman abstention primarily because the statutory scheme is unambiguous. It is true that, on its face, each parole statute involved appears unambiguous, and that the particular statute apparently governing the plaintiff class, 61 Penn.Stat.Ann. Sec. 331.26 (Purdon 1964), establishes no procedural safeguards for parole. We believe, however, that as counsel for the defendants insists, the parole legislation can and must be read as a whole. When so read, it is possible to construe the statutory scheme to afford procedural safeguards to the plaintiff class. At the very minimum, the coexistence of these two plausible interpretations gives rise to an ambiguity.
 
 
 35
 Counsel for the defendant judges repeatedly and emphatically represented that in view of the purposes of the parole system, and the chronology of legislative events, the procedures afforded prisoners serving less than two years in county prisons should also apply to prisoners transferred to state prisons, i.e., that 61 Pa.Stat.Ann. Sec. 314 "applies no matter where the prisoner is located." App. at A-37.[12] The defendant judges' interpretation is buttressed by 61 Pa.Stat.Ann. Sec. 331.1 (Purdon 1964), which states that "it is the intent of this act to create a uniform and exclusive system for the administration of parole in this Commonwealth."[13] Certainly the juxtaposition of statutory language expressly creating a "uniform and exclusive system" for parole and a statutory gap caused more than thirty years later by the governor's transfer of a certain class of prisoners presents an unsettled question for statutory interpretation by the Pennsylvania state court: either the later transfer could be interpreted to undercut the earlier uniform scheme of parole, or the legislative and executive actions could be reconciled by extending the earlier procedural protections to the transferred prisoners.
 
 
 36
 The dissent finds the former interpretation clear and indisputable; counsel for the defendant judges as well as the Attorney General, however, expressly adopt the latter interpretation.[14] Two Supreme Court decisions demonstrate that the interpretation proffered by counsel for officials charged with enforcing the state statute in question is entitled to considerable attention in the abstention context. In Carey v. Sugar, 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976) (per curiam), plaintiff brought a Sec. 1983 action to challenge the apparent lack of an adequate preliminary hearing in state prejudgment attachment proceedings. A three-judge district court declined to abstain, and the Supreme Court vacated and remanded with instructions to abstain under Pullman. 425 U.S. at 79, 96 S.Ct. at 1211. The Court noted, in terms directly relevant to our case:
 
 
 37
 injunctive relief against the state officials who were defendants below appears particularly inappropriate in light of the fact that these officials contended below and continue to contend here that New York law does provide an opportunity for a preliminary hearing on the merits of a plaintiff's underlying claim.
 
 
 38
 Id. Accord, Bellotti v. Baird, 428 U.S. 132, 148, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976).
 
 
 39
 Abstention is invoked to allow a state judiciary to construe statutes or statutory schemes which appear constitutionally problematic on their face, but which may be subject to a saving construction. The need for state court interpretation results not only from unclear language on the face of a single statute, but also from the juxtaposition of clear, but contradictory state provisions. In Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), the Supreme Court reversed a district court that failed to abstain in a case challenging an Alaska fishing statute that was clear on its face, but that, when read in the light of state constitutional provisions, presented an unclear question of state law. Cf. Harrison v. NAACP, 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959). Similarly, here, when the relevant state laws are read together, rather than independently, ambiguity arises. We would do well to allow the state courts to resolve that ambiguity, particularly as there is strong evidence that they will do so in a manner that will both satisfy the plaintiff on the merits and obviate the need to decide a constitutional question with serious implications for federal-state relations.[15]
 
 
 40
 Plaintiffs contend that we should disregard the judges' interpretation because the record shows that in fact the parole procedures have been applied inconsistently in the past to members of the plaintiff class. They argue that since they challenge the statutory scheme as applied as well as on its face, abstention is inappropriate. Our decision to abstain, however, rests not upon the consistency of defendants' actions, but on the plausibility of their interpretation, and on the effect of that interpretation on the constitutional questions raised.[16] The "as applied" character of plaintiffs' challenge, moreover, is of limited consequence at this point, for whatever has happened in the past in the absence of a definitive state court ruling, we must presume that state judges will follow the mandate of such a ruling when it is obtained.
 
 
 41
 There is no blanket exception to Pullman abstention for "as applied" challenges; indeed, in certain circumstances "abstention ... might be more appropriate when a challenge is made to the state statute as applied, rather than upon its face, since the reach of an uncertain state statute might, in that circumstance, be more susceptible of a limiting or clarifying construction." Steffel v. Thompson, 415 U.S. 452, 474-75 n. 21, 94 S.Ct. 1209, 1223 n. 21, 39 L.Ed.2d 505 (1974); see also, Procunier v. Martinez, 416 U.S. 396, 401 n. 5, 94 S.Ct. 1800, 1805 n. 5, 40 L.Ed.2d 224 (1974).[17] If in this case there were either a definitive state court ruling or a clear statutory mandate, and the judges still failed to act consistently, an "as applied" challenge would be appropriate and Pullman abstention would be unnecessary. The inapplicability of Pullman to such a case would turn not on the "as applied" character of the lawsuit, but on the clarity of the state law. Where, however, as here, a state statute is unclear and a state law issue is unresolved, inconsistent applications are to be expected; in such a situation both the facial challenge and the "as applied" challenge may be materially affected by state court resolution of the state law issue, and if so, Pullman abstention is appropriate. To rule otherwise would be to presume that state judges will not follow the heed of superior courts in their own state. Such a presumption would itself violate the fundamental principles of federalism that undergird the abstention doctrine.
 
 
 42
 Plaintiffs' final argument against abstention is that there is no procedure for obtaining state court review of the unresolved state law issue. If state court review were in fact impossible to achieve, Pullman abstention would of course serve no purpose. It appears, however, that a prisoner challenging procedural deficiencies in a parole determination has three alternative routes for appeal.[18]
 
 
 43
 First, such a claim may be cognizable under the Post Conviction Hearing Act (PCHA), 42 Pa. Cons.Stat.Ann. Sec. 9543 (Purdon 1982). While the PCHA might appear to be limited to challenges to convictions, the Pennsylvania Supreme Court has construed it to extend to challenges to deficiencies in a parole revocation hearing. In Commonwealth v. Tinson, 433 Pa. 328, 249 A.2d 549 (1969), the Court held that a challenge to an unlawful parole revocation was cognizable under the PCHA, which provides relief to a person who proves: "(c) That his conviction or sentence resulted from ... (6) The denial of his constitutional right to representation by counsel." The Court reasoned that appellant was claiming "that the part of his sentence that he has served since his recommitment hearing is a result of his not being represented by counsel at that hearing." 433 Pa. at 331, 249 A.2d at 551. Similarly, one challenging parole procedures not in conformity with Pennsylvania law might appeal under the PCHA provision that allows appeals from sentences that result from "the abridgement in any other way of any right guaranteed by the constitutions or laws of this Commonwealth." 42 Pa. Cons.Stat.Ann. Sec. 9543(3)(xii).
 
 
 44
 If the PCHA does not afford relief, plaintiff would have a cognizable petition for writ of habeas corpus. The writ of habeas corpus lies for any unlawful detention, 42 Pa. Cons.Stat.Ann. Secs. 6502, 6503 (Purdon 1982), except where relief is available under the PCHA. See 42 Pa. Cons.Stat.Ann. Sec. 6503(b). As the Court in Tinson stated, "Writs of habeas corpus may still be had in cases not covered by the PCHA ... so that were this case without the PCHA, habeas corpus relief would be possible in this proceeding." 433 Pa. at 331_, 249 A.2d at 551; see also Commonwealth v. Isabell, 503 Pa. 2, 467 A.2d 1287 (1983); Commonwealth v. Maute, 263 Pa.Super. 220, 227, 397 A.2d 826, 829 (1979). The habeas corpus petition would assert that because the prisoner has been denied parole without statutorily required parole procedures, he or she is being detained unlawfully.
 
 
 45
 Finally, if neither the PCHA nor habeas corpus provided remedies, plaintiff might seek a writ of mandamus. Under Pennsylvania law, a prisoner who is denied a hearing on his parole determination can file a petition for mandamus in the Commonwealth Court to compel such a hearing. In Moore v. Roth, 231 Pa.Super. 464, 331 A.2d 509 (1974), the Supreme Court held that a mandamus action in the Commonwealth Court is the appropriate vehicle for compelling the Board of Parole to conduct a hearing. It reasoned that the Commonwealth Court has exclusive jurisdiction by mandamus over "complaints against state agencies or officials that administrate the parole system." 331 A.2d at 510. The Court did not suggest that this jurisdiction was limited to decisions by the Board of Parole, as distinguished from those rendered by sentencing judges, and no authority has been cited to indicate that such jurisdiction does not exist over sentencing judges. Thus, it would appear that any member of the plaintiff class denied the Sec. 314 procedures could maintain an action in Commonwealth Court under mandamus.[19] See Hendrickson v. Pennsylvania State Board of Parole, 409 Pa. 204, 185 A.2d 581 (1962) (mandamus action challenging adequacy of Board of Parole procedures; court questioned propriety of mandamus, but reached merits "because of important substantive issue raised"); see also Kastner v. Commonwealth, Pennsylvania Board of Probation & Parole, 78 Pa.Cmwlth. 157, 467 A.2d 89 (1983) (mandamus lies where Board fails to exercise any discretion or capriciously abuses its discretion or violates a prisoner's constitutional right).
 
 
 46
 The dissent argues that mandamus lies only to compel clear, mandatory duties, so that to the extent we find the state law issue unclear, the availability of mandamus relief is called into question. Dissent at 1101. This argument fails, however, for the limitation of mandamus remedies to refusals to perform clear, mandatory duties is not intended to forestall judicial review of difficult legal issues, but primarily to prohibit intrusion on discretionary functions. If Sec. 314 applies, there is a mandatory duty to provide a hearing; if Sec. 314 does not apply, there is no such duty. What is certain is that resolution of the question does not turn on the sentencing judge's discretion. A plaintiff seeking mandamus could point to the fact that counsel for 300 state judges has represented that Sec. 314 applies, that the Attorney General has endorsed that position, and that this Court has abstained in large part because of those representations. If the state courts nonetheless turned plaintiff away, the district court would then reassert jurisdiction and could grant relief.[20]
 
 
 47
 The Constitution's civil rights guarantees, of course, must not be sacrificed to the interest of maintaining abstract federal-state relations. But where the state system is in a position to safeguard individual rights whether or not the federal courts step in, there is no need for, and much potential harm from, precipitous intrusion. Pullman abstention, it is necessary to recall, "does not ... involve the abdication of federal jurisdiction, but only the postponement of its exercise." Harrison v. NAACP, 360 U.S. at 177, 79 S.Ct. at 1030.[21] Abstention therefore pays heed to the comity concerns of our federal-state system while maintaining federal authority to guarantee individual rights if need be.
 
 
 48
 We are aware that there are some costs associated with Pullman abstention, particularly the possibility of consequent delays in the resolution of a case. See Frederick L. v. Thomas, 557 F.2d 373, 383-84 (3d Cir.1977).[22] Such costs might well be relevant, if the delay occasioned by our abstention resulted in regular deprivations of prisoners' Sec. 314 hearing rights, but the record does not suggest that this will happen. The record demonstrates only that from 1979 through 1981, persons in the plaintiff class were denied parole hearings in certain jurisdictions. Plaintiffs have conceded, however, that no prisoner has attempted to appeal the denial of a hearing through the state courts since the institution of this litigation. This may suggest that at least since the consent decree, the defendants are conforming their practice to their position in the litigation, by affording Sec. 314 procedures to members of the plaintiff class.
 
 
 49
 In any event, the possibility of delay alone should not serve as the basis for eschewing abstention when the plaintiffs could have pursued their remedies in state court in the first instance, and when resolution of the state law issue promises full and effective relief. Given the position of many of the defendant judges, this dispute could have been definitively resolved in short order had the litigants pursued their grievance by suit in the state court system. Indeed, such an action could have been filed concurrently with the federal action, thereby avoiding any delay whatsoever should the state courts render an unsatisfactory ruling.[23]
 
 
 50
 Instead, this controversy has now been in the federal courts for well over three years. That a consent decree reflecting the parties' agreement on the substantive merits was revoked largely because of comity and federalism concerns only underscores the propriety of abstention. We conclude that "special circumstances" dictating abstention are presented by a federal lawsuit that seeks an injunction ordering three hundred state judges to provide parole procedures that the judges, and the state Attorney General, maintain are already required by state law. We do not, as the dissent suggests, order abstention to be fashionable, nor to deny prisoners access to federal courts. See Dissent at 1095, 1098, 1102. Rather, we maintain that where state law appears to resolve the sole issue in the case to plaintiffs' satisfaction, and where the parties' only real disagreement concerns the propriety of federal intervention, the case may be more appropriately resolved in state court. As the Supreme Court has noted, there is a "need for restraint by federal courts, called on to enjoin the actions of state judicial officers." Pulliam v. Allen, 466 U.S. 522, 104 S.Ct. 1970, 1980, 80 L.Ed.2d 565 (1984). If we do not need to intrude, we should not. We can only know if intervention is required if we first abstain.
 
 IV.
 
 51
 For the foregoing reasons, the judgment of the district court will be vacated and the case remanded so that the district court may abstain pending resolution in state court of whether 61 Pa.Stat.Ann. Sec. 314 applies to members of the plaintiff class.
 
 
 52
 SLOVITER, Circuit Judge, with whom Judges GIBBONS, HIGGINBOTHAM and MANSMANN join, dissenting.
 
 
 53
 In their zeal to deprive the plaintiff class of prisoners access to federal court to assert their federal constitutional rights, the majority extends the abstention doctrine in contravention of the relevant Supreme Court precedent.
 
 
 54
 In Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984), the Supreme Court's most recent discussion of abstention under the standards announced in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Court reiterated that "federal courts need not abstain on Pullman grounds when a state statute is not 'fairly subject to an interpretation which will render unnecessary' the federal constitutional question," quoting Harman v. Forssenius, 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965). As the Court continued, "Pullman -abstention is limited to uncertain questions of state law because '[a]bstention from the exercise of federal jurisdiction is the exception, not the rule.' Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)." Hawaii Housing Authority, 104 S.Ct. at 2327.
 
 
 55
 In Hawaii Housing Authority, large landowners had sued in federal court seeking to enjoin enforcement of the Hawaii Land Reform Act, alleged to be unconstitutional. The state-related appellants suggested that abstention was required under Pullman, a suggestion that was emphatically rejected by a unanimous court, speaking through Justice O'Connor, who said:
 
 
 56
 The dissenting judge in the Court of Appeals suggested that, perhaps, the state courts could make resolution of the federal constitutional questions unnecessary by their construction of the Act.... In the abstract, of course, such possibilities always exist. But the relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary. Rather, "[w]e have frequently emphasized that abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction." Zwickler v. Koota, 389 U.S. 241, 251, and n. 14, 88 S.Ct. 391, 397, and n. 14, 19 L.Ed.2d 444 (1967). These statutes are not of an uncertain nature and have no reasonable limiting construction. Therefore, Pullman abstention is unnecessary.
 
 
 57
 Id. (emphasis in original).
 
 
 58
 The majority avoids the impact of Hawaii Housing Authority and the impressive list of its progenitors that counsel against abstention when the state law is not uncertain, see, e.g., Harman v. Forssenius, 380 U.S. 528, 534-36, 85 S.Ct. 1177, 1181-83, 14 L.Ed.2d 50 (1965); Davis v. Mann, 377 U.S. 678, 690, 84 S.Ct. 1441, 1447, 12 L.Ed.2d 609 (1964); Baggett v. Bullitt, 377 U.S. 360, 375-78, 84 S.Ct. 1316, 1324-26, 12 L.Ed.2d 377 (1964); McNeese v. Board of Education, 373 U.S. 668, 673-74, 83 S.Ct. 1433, 1436-37, 10 L.Ed.2d 622 (1963); City of Chicago v. Atchison, Topeka & Santa Fe Railway, 357 U.S. 77, 84, 78 S.Ct. 1063, 1067, 2 L.Ed.2d 1174 (1958), by maintaining that there is an "unsettled question for statutory interpretation" by the Pennsylvania state courts. See Majority op. at 1089. However, the abstention doctrine contemplates deference to state court adjudication where the issue of state law is uncertain only if the state statute is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question", Harman v. Forssenius, 380 U.S. at 535, 85 S.Ct. at 1182 (emphasis added). No case suggests that abstention was intended to invite a federal court to manufacture ambiguities in statutory provisions where none exist.
 
 
 59
 The ephemeral nature of the uncertainty created not by the Pennsylvania statute but by the majority is evident when the statutory scheme is examined from its inception. The division of authority as to parole decisions between sentencing judges and an administrative board was established in 1911 shortly after parole was introduced as part of the Pennsylvania system of penology. The Act of June 19, 1911, Sec. 1, 1911 Pa.Laws 1059, as amended by the Act of May 11, 1923, No. 151, Sec. 1, 1923 Pa.Laws 204, now codified at Pa.Stat.Ann. tit. 61, Sec. 314 (Purdon 1964), placed decisions as to parole of inmates in county jails, houses of correction or workhouses in the hands of the judges of the respective judicial districts. That Act also provided for a hearing, as it continues to do. Contemporaneously, the legislature enacted another statute giving administrative agencies (the predecessors to the present Board) the authority and responsibility to parole inmates in state facilities, and regulating the procedures to be followed. Act of June 19, 1911, Secs. 6-17, 1911 Pa.Laws 1055, 1055-59 (codified as amended at Pa.Stat.Ann. tit. 61, Secs. 302-13 (Purdon 1964) (repealed in part, Judiciary Act Repealer Act, No. 53, Sec. 2(a), 1978 Pa.Laws 202, 282)).
 
 
 60
 In 1941, the legislature created the Pennsylvania Board of Parole (now the Pennsylvania Board of Probation and Parole). Act of Aug. 6, 1941, No. 323, 1941 Pa.Laws 861 (codified as amended at Pa.Stat.Ann. tit. 61, Sec. 331.1 (Purdon 1964 & Supp. 1984-85)) (hereafter 1941 Act or Parole Act). This statute vested the Board with the exclusive parole decisionmaking authority for all inmates sentenced to a maximum of two years or more, whether they are in a state or county penitentiary, prison or penal institution. Pa.Stat.Ann. tit. 61, Sec. 331.17 (Purdon Supp.1984-85). It altered the parole jurisdiction of the sentencing courts, withdrawing their jurisdiction over those inmates now covered by the Board, Act of Aug. 6, 1941, No. 323, Sec. 35, 1941 Pa.Laws at 872, but retaining their jurisdiction over all inmates with maximum sentences of less than two years, whether they were in state or county institutions, Pa.Stat.Ann. tit. 61, Sec. 331.26 (Purdon 1964).
 
 
 61
 The 1941 Act set forth the procedures to be followed by the Board when it makes a parole determination. Id. Sec. 331.22. The Board has discretion to hold a hearing on an application, but may not grant parole or dismiss an application unless the prisoner is interviewed by a district supervisor. If an application for parole is denied, the Board must file a statement of the reasons for its decision. If possible, the Board is to act on an application before the expiration of the minimum sentence, but it must make its decision within thirty days after the expiration of the minimum sentence.
 
 
 62
 The procedures, established by the 1911 Act which remains applicable, differ when the sentencing court makes the parole determination. When a prisoner who is "confined in a county jail, house of correction or workhouse" submits a verified petition for parole, the court must hold a hearing before it enters the order on the application. Pa.Stat.Ann. tit. 61, Sec. 314 (Purdon 1964). No other procedure is specified. The court is not bound to procedures comparable to those required when the Board makes the parole determination, such as, for example, a statement of reasons why parole has been denied.
 
 
 63
 In contrast to the procedures required by section 331.22 when the Board makes the parole determination for prisoners sentenced to a maximum of two years or more, and by section 314 when the sentencing court makes the parole determination for prisoners with lesser sentences who are in county jails, there is no provision governing the procedures when the sentencing court makes the parole determination for prisoners sentenced to less than two years and confined in state facilities. The legislature did not amend section 314 to apply to inmates in state institutions, despite the fact that in Commonwealth v. Kulick, 5 Wash. [Pa.] C.Rep. 166 (1925), the court held that section 314 by its own terms applied only to inmates in county facilities, not state facilities. The court referred to the rationale for dividing authority as to inmates in state and county institutions, noting that if parole decisions as to inmates in state institutions were "divided up among the courts of many different counties", they would "hav[e] a lack of uniformity" which could "throw[ ] into confusion" the "control and management of state correctional institutions" and affect adversely "their discipline and morale." Id. at 168. See also Commonwealth v. Ripka, 37 Pa.D. & C. 315, 318-20 (1940). The majority discounts these precedents because of their age, see Majority op. at 1090 n. 14, but cites to no contrary authority from a Pennsylvania court.
 
 
 64
 The absence of any procedure governing the plaintiff class became crucial because a recent Pennsylvania statute authorizes prisoners with maximum sentences of less than two years to be confined in state facilities, if the Governor issues a proclamation making state facilities available. 42 Pa.Cons.Stat.Ann. Sec. 9762(3) (Purdon 1982). It is conceded by defendants that there are such prisoners in state institutions. According to the complaint there are a minimum of 576 such inmates, but at times there have been as many as 1,332. It is apparent, therefore, that the statutory scheme contains a gap, but this does not manifest an ambiguity such as the Pullman doctrine is designed to clarify.
 
 
 65
 The language which the majority construes as giving rise to an ambiguity as to the procedures to be applied to the plaintiff class does not appear in one of the operative provisions of the Act, but only in the title of the 1941 Act[1] and in the provision referred to as the Policy Section. The statement that "it is the intent of this act to create a uniform and exclusive system for the administration of parole in this Commonwealth," Pa.Stat.Ann. tit. 61, Sec. 331.1, hardly supplies an ambiguity. It is evident from the text of the Act, which establishes the Parole Board and prescribes its authority, that it does not purport to govern the parole operation of the sentencing courts.[2] Thus, the "uniform and exclusive system" referred to in the title and policy section is that applicable to prisoners sentenced to 2 years or more, to whom that Act applied, rather than to prisoners in plaintiff class, over whom the Parole Board has no jurisdiction.
 
 
 66
 The "intent" language does not constitute a "juxtaposition of clear, but contradictory state provisions" such as confronted the Court in Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), on which the majority relies. See Majority op. at 1091. It is an established precept of statutory construction that "the policy section ... is available for the clarification of ambiguous provisions of the statute, but may not be used to create ambiguity." See 1A Sutherland's Statutes and Statutory Construction, Sec. 20.13 (Sands 4th ed. 1985). Federal courts must be careful not to create ambiguities where none exist in an attempt to ride what is perceived to be a fashionable wave of door closing to the federal courts.[3] The only reasonable reading of the Pennsylvania statutory scheme is that it simply makes no provision for parole procedures for members of the plaintiff class. It appears that they fell between the cracks of the reorganized parole statutes.[4]
 
 
 67
 In effect, the argument for abstention in this case is not significantly different than the argument for abstention rejected by the Supreme Court in Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), where the challenge was to a certificate of residency requirement for voting which was alleged to conflict with the Twenty-Fourth Amendment to the Constitution. There, as here, the state suggested that the state "tribunals are 'unquestionably far better equipped than the lower [federal] courts to unravel the skeins of local law and administrative practices in which the Appellees' claims are entangled,' " 380 U.S. at 535, 85 S.Ct. at 1182. There, as here, the state argued that a state court construction might invalidate the statute under Virginia state law and thereby obviate the constitutional challenge. Id. at 536, 85 S.Ct. at 1183. A unanimous Court, through Chief Justice Warren, rejected abstention, finding the legislative language clear. Here as well, the legislative language is clear. The mere possibility that the Pennsylvania courts may construe the statutes to mean what they do not say is no reason for a federal court to abstain, and no Supreme Court case holds otherwise.
 
 
 68
 In Carey v. Sugar, 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976) (per curiam), the principal Supreme Court authority on which the majority relies, the district court had held the New York state prejudgment attachment statute unconstitutional because it failed to give the debtor a meaningful opportunity to vacate an attachment. However, as the Supreme Court noted, the statute had an explicit provision giving the debtor the opportunity to move for an order vacating or modifying the order of attachment, and the only issue was the "precise nature of any inquiry into the merits which will be made by the New York courts." Id. at 78, 96 S.Ct. at 1210. Since there already had been an early New York Court of Appeals decision on that issue, and two New York trial courts had decisions subsequent to the district court order, the Supreme Court held that the circumstances made it unwise for it to address the constitutionality of the New York attachment statute. That decision is hardly "directly relevant to our case", as the majority states. Majority op. at 1086. To the contrary, here the majority concedes that it cannot point to a statutory provision that could arguably give plaintiff prisoner class the procedural due process in parole decisions that are applicable to other prisoners. Majority op. at 1088. As in Harman v. Forssenius, the majority "does not point to any provision in the legislation" that leaves "reasonable room for a construction" that could avoid the constitutional issue. 380 U.S. at 536, 85 S.Ct. at 1183 (emphasis added). Certainly, the mere statement in a statute prescribing procedures for the Parole Board that it is intended to establish a uniform and exclusive system, patently applicable only to the system operated by the Parole Board, cannot reasonably be construed as a provision that could avoid the constitutional issue. Thus abstention is patently inappropriate on the basis given by the majority.
 
 
 69
 The majority relies on the representation of counsel[5] that the gap in the statutory scheme will be resolved by the state courts' interpretation of the provisions of section 314 as applicable to members of the plaintiff class. See Majority op. at 1090, 1091 n. 16. No state court has so held, either prior to this litigation or during the four years since this case was filed, and the only Pennsylvania case to have addressed the issue held to the contrary. See Commonwealth v. Kulick, supra. Moreover, the majority errs when it states that counsel for the defendant class has consistently taken the position that section 314 procedures apply to the plaintiff class. Majority op. at 1090 & n. 12. In the state court proceeding filed by these judges to compel the Attorney General of Pennsylvania to defend this action, the judges, represented by the same counsel, took the position that the procedures of section 314 did not apply to the plaintiff class. In their petition for review filed in the Commonwealth Court they stated that "Were the Judicial Defendants required to revise the language of 61 P.S. Sec. 314 pursuant to remedial relief afforded in the Georgevich case, or in settlement, they would be introducing into that statute an express declaration of the right to a hearing upon application for parole not presently existing therein." See Brief of Amicus, Exh. A. at 4 (emphasis added).
 
 
 70
 The only evidence in this record unambiguously shows that the sentencing judges are not applying the procedures of section 314, which requires, for example, that upon the presentation of a verified petition for parole "the court shall fix a day for hearing." Pa.Stat.Ann. tit. 61, Sec. 314 (Purdon 1964). The judges' own answers to interrogatories reveal that, in fact, many courts are not providing such a hearing, even when they deny the parole application. Of the 35 (out of the relevant statewide total of 59) judicial districts who responded to the Interrogatories with regard to their procedures for the three year period beginning in 1979, 9 jurisdictions reported that they never held a hearing before denying a parole application; 2 reported always holding a hearing, and 3 sometimes did. A number of other jurisdictions responded that they either received no applications or that they granted all that they received.
 
 
 71
 There is no basis in this record for the majority's speculation that defendant judges are affording section 314 procedures to members of the plaintiff class. See Majority op. at 1095. They have never represented that they are. Defendants' counsel admitted here that there were "inconsistencies in statewide practices." App. at 35.[6] Thus, even if plaintiffs were limited to claiming unequal protection of the law as applied, the federal court would not be able to avoid the constitutional issue. Under these circumstances, Pullman abstention is inappropriate. See Baggett v. Bullitt, 377 U.S. 360, 375-78, 84 S.Ct. 1316, 1324-26, 12 L.Ed.2d 377 (1964); Cinema Arts, Inc. v. County of Clark, 722 F.2d 579, 581-82 (9th Cir.1983).
 
 
 72
 The majority's response to plaintiffs' argument that abstention is inappropriate when plaintiffs challenge the statutory scheme as applied is to extend the Pullman abstention doctrine even further, again without precedent. The authority it cites for the proposition that "abstention ... might be more appropriate when a challenge is made to the state statute as applied, rather than upon its face", Majority Typescript op. at 1092, is, in the words of the perceptive Alice, "Curiouser and curiouser". See L. Carroll, Alice in Wonderland 18 (Wanderer Book ed. 1982). It cites Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), which involved not Pullman abstention but Younger abstention because there was an ongoing criminal action.[7] Furthermore, in Steffel v. Thompson, the Court held that the lower courts had erred in abstaining since no state criminal proceeding was pending at the time the federal complaint was filed. Rather than serving as precedent for the majority's position, that case held that "the relevant principles of equity, comity, and federalism 'have little force in the absence of a pending state proceeding.' Lake Carriers' Assn v. MacMullan, 406 U.S. 498, 509 [92 S.Ct. 1749, 1757, 32 L.Ed.2d 257] (1972)." Id. at 462, 94 S.Ct. at 1217. Here, of course, there is no pending state proceeding.
 
 
 73
 Similarly, the other case cited by the majority for the proposition that abstention is "more appropriate" in "as applied" challenges, Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), holds exactly to the contrary, rejecting abstention in these circumstances. Instead, Procunier stands as an additional authority for the principle that federal courts should not abstain when the plain meaning of the state statute is not susceptible of a limiting construction, id. at 402-04, 94 S.Ct. at 1806-07, which is contrary to the majority's holding in this case.
 
 
 74
 The majority's response to this dissent is twofold. First, it suggests that if the federal courts abstain, the state courts will resolve the issue because defendants "essentially agree on the substantive merits of the plaintiff's request, but primarily object to a federal court ordering relief that the state itself is in a position to provide." See Majority Typescript op. at 1089 n. 11. As noted above, rather than agree, the judges have averred in state court that section 314 provides no right to plaintiffs. Also, the fact remains that during the three years this case has been pending in the federal court, and while the district court did in effect abstain, the defendant judges have taken no steps to effectuate any formal procedure, by rule or otherwise, that would establish parole procedures for the members of the plaintiff class. Nothing in the pending federal court action deprived the state courts of the opportunity during the pendency of this action to voluntarily establish rules or procedures to fill the gap left in the statutes. Indeed, as noted by the Supreme Court in Gerstein v. Pugh, while that case (challenging the procedures available to arrestees) was pending, the Dade County judiciary voluntarily adopted a similar procedure on its own. See 420 U.S. 103, 109, 95 S.Ct. 854, 860, 43 L.Ed.2d 54 (1975). Similarly, in another case, while a petition for certiorari was pending from an opinion of this court, the New Jersey Supreme Court acted to remedy the gap in the New Jersey disciplinary proceedings to which our opinion had been directed. See Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423, 431 & n. 9, 102 S.Ct. 2515, 2520 & n. 9, 73 L.Ed.2d 116; id. at 438-39, 102 S.Ct. at 2524-25 (1982) (Marshall, J., concurring). The Pennsylvania state judiciary was free to take whatever action it deemed appropriate with regard to the underlying issue in this case. It did nothing!
 
 
 75
 The majority suggests, however, that the obligation was that of the plaintiffs who "could have pursued their remedies in state court in the first instance...." Majority op. at 1094. Thus, the majority's second response to this dissent is, in effect, a reimposition of an exhaustion requirement, dressed in a different garb. The majority opinion imposes on plaintiff prisoners an obligation to file a suit in state court. Even if there were an available mechanism by which they could do this, which is questionable, the same arguments that the majority eloquently used to reject any exhaustion requirement in Sec. 1983 suits are equally applicable here. The majority's disclaimer that it is requiring plaintiffs to exhaust falls hollow. "E pur si muove! "[8]
 
 
 76
 Moreover, the majority is hardly convincing when it suggests that plaintiffs could have raised their constitutional equal protection argument in the context of a state PCHA proceeding, habeas corpus, or mandamus. The PCHA statute applies to provide "relief from convictions obtained and sentences imposed without due process of law", 42 Pa.Cons.Stat.Ann. Sec. 9542. The parole procedure does not fit within this language. The only case cited by the majority, Commonwealth v. Tinson, 433 Pa. 328, 249 A.2d 549 (1969), involved parole revocation, which is comparable to a sentence imposed and is hardly applicable to prisoners seeking a parole determination or to a class action to determine their rights.
 
 
 77
 While the state courts might recognize a class action seeking a writ of habeas corpus, the majority's second suggested state procedure, it cites no case for the proposition that such a writ may be used by a prisoner seeking parole who is not contesting his or her initial sentence or conviction. The only cases cited are patently inapplicable.[9] No Supreme Court case counsels abstention when the state remedy may prove to be illusory.
 
 
 78
 The majority's third state route, a writ of mandamus, suffers from similar weaknesses. The majority relies on cases that held that mandamus was the appropriate vehicle for compelling the Board of Probation and Parole to conduct a hearing. See, e.g., Moore v. Roth, 231 Pa.Super. 464, 468-69, 331 A.2d 509, 511 (1974). As noted above, a statute expressly provides that the Board must conduct a hearing. None of those cases suggested that mandamus could be used to compel a hearing for a prisoner seeking parole from a sentencing judge in the absence of a statute expressly providing therefor.
 
 
 79
 On the contrary, Pennsylvania courts have consistently applied the principle that mandamus is available only when plaintiff has a clear right. See Highway Paving Company v. State Board of Arb. of Claims, 407 Pa. 528, 180 A.2d 896 (1962), cited in Hendrickson v. Pennsylvania State Board of Parole, 409 Pa. 204, 206, 185 A.2d 581, 583 (1962). In Hamm v. Board of Education, 79 Pa.Commw. 547, 470 A.2d 189 (1984), for example, the court held that a mandamus action was an inappropriate method to challenge the constitutionality of a statute providing for mandatory retirement of public school teachers. The court stated, "the purpose of mandamus is not to establish legal rights, but to enforce those rights already established beyond peradventure." Id. at 549, 470 A.2d at 190. See also Francis v. Corleto, 418 Pa. 417, 421, 211 A.2d 503, 505 (1965) (mandamus will not be granted in doubtful cases); County of Mifflin v. Mifflin County Airport Authority, 63 Pa.Commw. 56, 437 A.2d 781 (1981) (absence of clear right to transfer of property precluded mandamus); Fraternal Order of Police v. Shapp, 22 Pa.Commw. 267, 348 A.2d 502 (1975) (mandamus inappropriate to determine whether enforcement officers of Liquor Control Board were policemen or public employees for purposes of collective bargaining statute).
 
 
 80
 In the face of these cases, it is unlikely that the Pennsylvania courts will hold mandamus is available to compel hearings for those prisoners for whom the statute makes no provision. It is somewhat disingenuous for the majority to claim on the one hand that the statute is so ambiguous that we must abstain and, on the other hand, that the prisoners' right to a hearing is sufficiently clear to support a mandamus action. In any event, even if state court review were possible by some extension of the statutes and precedents, the majority has failed to explain adequately why requiring the plaintiffs to undertake such review is not, in fact, imposition of an exhaustion requirement.
 
 
 81
 Other factors also counsel against abstention here. In Frederick L. v. Thomas, 557 F.2d 373 (3d Cir.1977), we held that even though the state statutes at issue were not completely free from ambiguity, Pullman abstention was inappropriate because it was not invoked until more than a year after the complaint was filed. Id. at 383-84. More time has already passed in this case. Here abstention was suggested for the first time on the eve of settlement, long after suit was filed and substantial proceedings took place. The same reasons not to apply Pullman abstention are present here as in Frederick L., where Judge Adams, speaking for the court, stated that abstention would lead to the strong possibility "of substantial retardation in the progress of [the] lawsuit and consequent prejudice to the rights of plaintiffs." Id. at 383. See generally Field, Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine, 122 U.Pa.L.Rev. 1071, 1085-87 (1974). The members of the plaintiff class, who seek parole hearings in the midst of their less than two year sentence, are likely to be substantially prejudiced if they must await decision by a state court in an as yet unfiled law suit.
 
 
 82
 Abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188, 79 S.Ct. 1060, 1062, 3 L.Ed.2d 1163 (1959). It should not be invoked "in the absence of special circumstances." Propper v. Clark, 337 U.S. 472, 492, 69 S.Ct. 1333, 1344, 93 L.Ed. 1480 (1949). The majority shows no such circumstances here.
 
 
 83
 The issue that divides this in banc court is not how the Pennsylvania statutes should be construed. It is the substantially more significant question of whether federal courts will continue to be available fora to secure the liberty interests of the unpopular and rejected elements of our society. The right asserted here by the plaintiff class is not an insignificant one. Its members seek hearings on their parole applications, hearings that Pennsylvania expressly grants to other prisoners similarly situated, and that the statute and the judges' practices deny them. It is disquieting that the same voices that have declined to abstain when the federal plaintiffs were corporate and business litigants, see, e.g., Kennecott Corp. v. Smith, 637 F.2d 181, 184-85 (3d Cir.1980); Mariniello v. Shell Oil Co., 511 F.2d 853, 860-61 (3d Cir.1975), now expand the abstention doctrine to deny access to litigants who effectively have no where else to go. Just as the federal tribunals were previously needed "to create a great common market within the grand design of the Commerce Clause," and later to insure to "Negroes ... the full benefits of the Fourteenth ... and Fifteenth Amendments," see England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 432, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (Douglas, J., concurring), now they are called upon to play the same role for prisoners, who are frequently unwelcome litigants, and tomorrow they may be called upon to do so for another group. Even if the majority's holding were to be viewed by some as a step toward lightening the dockets of the federal courts, it is in derogation of our constitutional and statutory responsibility.
 
 
 
 [1]
 The relevant portion of section 331.22 provides:
 The board shall have the power ... to grant paroles of its own motion whenever in its judgment the interests of justice require the granting of the same. In addition thereto, the board shall have the power, and it shall be its duty, to consider applications for parole by a prisoner or by his attorney, relatives or friends or by any person properly interested in the matter. Hearings of applications shall be held by the board whenever in its judgment hearings are necessary. Reasonable rules and regulations shall be adopted by the board for the presentation and hearing of applications for parole: Provided, however, That whenever any prisoner is paroled by the board, whether of its own motion or after hearing of an application therefor, or whenever an application for parole is refused by the board, a brief statement of the reasons for the board's action shall be filed of record in the offices of the board and shall be at all reasonable times open to public inspection; in no case shall a parole be granted, or an application for parole be dismissed, unless a district supervisor shall have seen and heard him in person in regard thereto within six months prior to the granting or dismissal thereof. Application shall be disposed of by the board within six months of the filing thereof. Except in cases where the Pardon Board has reduced a minimum term by commutation, the board shall initially act on the application, if possible, before the expiration of the minimum term so fixed, and in no case more than thirty days thereafter.
 In granting and revoking paroles, and in discharging from parole, the members of the board acting thereon shall not be required to personally hear or see all the witnesses and evidence submitted to them for their action, but they may act on reports submitted to them by their agents and employes, together with any pertinent and adequate information furnished to them by fellow members of the board or by others.
 At least ten days before paroling a prisoner on its own motion the board shall give written notice of such contemplated parole to the district attorney of the county wherein the prisoner shall have been sentenced, and, in cases of hearings on applications for parole as herein provided for, at least ten days written notice of the time and place fixed for such hearing shall be given either by the board or by the applicant, as the board shall direct, to the court and district attorney of the county wherein the applicant shall have been sentenced.
 (footnote omitted).
 
 
 [2]
 Section 331.26 provides, in relevant part:
 Paroles from imprisonment for less than a maximum period of two years shall be granted by the sentencing court and shall, together with all probations except probation as to which supervision is specially ordered by the court as provided for in section twenty-five of this act, be without supervision by the board.
 (footnote omitted).
 
 
 [3]
 Section 314 provides in part:
 The courts of quarter sessions and the courts of oyer and terminer of the several judicial districts of the Commonwealth, and other courts of record having jurisdiction, are authorized, after due hearing, to release on parole any convict confined in the county jail, house of correction, or workhouse of their respective district. No convict shall be paroled, under the provisions of this act, except upon petition verified by the oath of the person convicted or by someone in his or her behalf, and presented and filed in the court in which such person was convicted. Upon the presentation of any such petition, the court shall fix a day for hearing.... After such hearing, the court shall make such order as it may deem just and proper.
 Repealed in Part
 This section is repealed in so far as it relates to persons over whom exclusive jurisdiction to parole is vested upon the Board of Parole by act 1941, Aug. 6, P.L. 861, Sec. 35.
 
 
 [4]
 The legislature's intention to cover all possible situations is reflected in 61 Pa.Stat.Ann. Sec. 331.1 (Purdon 1964): "it is the intent of this act to create a uniform and exclusive system for the administration of parole in this Commonwealth."
 
 
 [5]
 Although plaintiffs originally alleged that their rights to equal protection were violated insofar as they were treated differently from (1) prisoners serving similar sentences in county institutions (to whom Sec. 314 applies), and (2) prisoners serving greater than two year sentences (to whom Sec. 331.22 applies), the latter claim appears to have been dropped. Thus, counsel for plaintiffs admitted at oral argument that his suit would be concluded were plaintiff class members afforded the procedures provided by Sec. 314. Counsel for plaintiffs also expressly disavowed any procedural due process claim at oral argument, explaining that he intended to claim only an equal protection violation
 
 
 [6]
 The proposed consent decree provided, in pertinent part:
 
 
 [1]
 The parties and the classes they represent are desirous of clarifying the rights, duties and obligations of the respective classes to each other in relationship to procedures affecting parole release decisions or determinations
 
 
 [2]
 The entry into this Consent Decree shall not be construed as creating a substantive right to be paroled
 
 
 [3]
 The entry into this Consent Decree shall in no way be considered an admission of liability or wrong doing on the part of anyone concerned
 
 
 [4]
 Whenever a Common Pleas sentencing Judge in Pennsylvania receives an application, petition, or request for release on parole by a member of the Plaintiff class of inmates, which is verified by oath of the person convicted or by someone in his or her behalf, said Judge will set a date for a hearing at or before the inmate's minimum release date, at which time the inmate shall appear before him. A copy of said application, petition, or request for release on parole shall be served upon the District Attorney and upon the prosecutor in the case at least ten (10) days before the day fixed for said hearing. Proof of service upon the District Attorney and the prosecutor shall be produced at the hearing. Provided that no hearing pursuant to this paragraph will be required to be held less than fifteen (15) days from the date of receipt of the application, petition, or request for release on parole, by the Common Pleas sentencing Judge
 
 
 [5]
 After the hearing, the Court will make such an Order concerning the release on parole as it determines is just and proper, providing that if parole is denied or refused or not granted that [sic] the inmate will receive a written statement of reasons for this action
 
 
 [6]
 No claim or cause of action shall accrue to an inmate member of the Plaintiff class for failure to follow the parole procedures set forth in this Consent Decree, if (s)he is actually released on parole at the minimum expiration date of his (her) sentence or within fifteen (15) days of the date of receipt of the application, petition, or request for release on parole, by the Common Pleas sentencing Judge; whichever date shall occur later
 App. at 48-51.
 
 
 [7]
 The distinction between cases that may be brought under Sec. 1983 because they challenge procedures and those asserting a right to be released which must be brought as habeas corpus actions has also been articulated by other courts of appeals, particularly in the context of parole. See, e.g., Walker v. Prisoner Review Board, 694 F.2d 499, 501 (7th Cir.1982); Williams v. Ward, 556 F.2d 1143, 1150 (2d Cir.), cert. dismissed, 434 U.S. 944, 98 S.Ct. 469, 54 L.Ed.2d 323 (1977); cf. Fernandez v. Trias Monge, 586 F.2d 848, 852 n. 4 (1st Cir.1978) (pretrial detention without probable cause hearing)
 
 
 [8]
 The district court stated in the alternative that even if plaintiffs' action was proper under Sec. 1983, exhaustion should be required because of federal-state comity concerns. App. at 111-12. This reasoning is precluded by the Supreme Court's holding in Patsy v. Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), that the judiciary may not fashion an exhaustion requirement in Sec. 1983 suits. Id. at 500-01, 102 S.Ct. at 2559-60
 
 
 [9]
 For his part, the Attorney General has proven to be a reluctant partner. Having been notified of the suit, the Attorney General declined the invitation to intervene. He did, however, request and receive from us leave to file a brief amicus curiae in which he argued that he would not be a proper party to the action. Thereafter, on the application of the defendant judges, the Supreme Court of Pennsylvania directed the Attorney General to seek intervention in this action. He did so, and we granted the motion. As intervenor, however, he has maintained his position that he is not the proper party defendant
 
 
 [10]
 We note that state judges have no general incapacity under Pennsylvania law to sue or be sued. Recently, the Commonwealth Court of Pennsylvania considered an action brought by the union representing certain court-appointed employees of the Court of Common Pleas of Philadelphia County against the President Judge acting individually and on behalf of all the judges of the Court of Common Pleas of Philadelphia County. See Local 810, AFSCME v. Commonwealth ex rel. Bradley, 84 Pa.Commw. 368, 479 A.2d 64 (1984). There was no suggestion that the judges, sued as managerial representatives for the courts, were improper parties. The year before, a suit brought by a member of the bar against the Court of Common Pleas of Cumberland County and Harold E. Sheely, its President Judge, seeking a writ of prohibition against enforcement of a county court rule governing admissions to its bar, was addressed on the merits by the Supreme Court of Pennsylvania without questioning the status of the President Judge as a proper party. See Laffey v. Court of Common Pleas of Cumberland County, 503 Pa. 103, 468 A.2d 1084 (1983). In that case, as here, the suit challenged the action of the court and judges in their administrative or enforcement capacity, rather than in their decision-rendering capacity
 Nor have the state judges shown any reluctance to file suit themselves in their administrative and enforcement roles. In Commonwealth ex rel. Carroll v. Tate, 442 Pa. 45, 274 A.2d 193 (1971), Judge Vincent A. Carroll, individually and on behalf of all the judges of the Court of Common Pleas of Philadelphia, instituted suit to compel the Mayor and City Council of Philadelphia to appropriate the additional funds requested by them for administration of the courts. There was no challenge to the power of the judges to file suit, and indeed the Supreme Court of Pennsylvania affirmed the judges' right to compel appropriation of necessary funds for judicial administration. If the judges are proper parties to sue in their administrative capacity, it follows that they are proper parties to be sued in that capacity.
 
 
 [11]
 Counsel for plaintiffs conceded at oral argument that if Sec. 314 procedures were held applicable to the plaintiff class, that would eliminate the need to address his equal protection claim. Counsel for defendants has consistently maintained that, under state law, Sec. 314 does apply to all prisoners serving less than two year sentences, including the plaintiff class. Defendant's interpretation is endorsed by the Pennsylvania Attorney General. See Brief for Intervenor-Appellee at 2
 Thus, we are faced in this case with defendants who essentially agree on the substantive merits of the plaintiff's request, but primarily object to a federal court ordering relief that the state itself is in a position to provide. Thus, this case raises federalism concerns not peripherally, nor as a background consideration, but as the central issue of dispute.
 
 
 [12]
 Counsel for the defendant class has taken this position consistently throughout the litigation. See App. at A-37; Pennsylvania Judiciary's Memorandum Supporting Motion to Dismiss at 3, 6; Appellees' Brief at 7 (all stating that 61 Pa.Stat.Ann. Sec. 314 applies to all prisoners, in county or state institutions)
 A consent decree entered and signed by counsel and both named parties created even more procedural safeguards than are contained in 61 Pa.Stat.Ann. Sec. 314, see supra note 6. As noted, thirteen members of the defendant class objected to the settlement. Three judges suggested only minor revisions. A54-56. Four judges felt that the decree went beyond present statutory requirements, and six judges objected to the decree as authorizing "unwarranted [federal court] interference with the state judiciary." App. at A57-A64. Thus, while there is not (and we could hardly expect) unanimity within the defendant class of over three hundred judges, the deviation is minimal, and much of it is limited to the propriety of federal intervention.
 
 
 [13]
 The dissent points out that some of this statutory language can also be found in the Act's original title, but then apparently concludes, without authority, that statutory language repeated in a statute's title should be given no effect. See Dissent typescript at 1098 n. 4. The dissent's citation to cases on the interpretive value of titles simply does not apply to plain statutory language contained in the very first section of the statute's text. See 61 Pa.Stat.Ann. Sec. 331.1 (Purdon 1964). Even if the cited language were exclusively contained in the title, we would not be required to ignore it. Under Pennsylvania law, "the title ... of a statute may be considered in the construction thereof." 1 Pa.C.S.A. Sec. 1924 (Purdon Supp.1984)
 
 
 [14]
 The only authority the dissent cites to refute the position advanced by defense counsel and the State Attorney General consists of two state decisions from 1925 and 1940, which respectively issued 49 and 34 years before the "gap" was created by the governor's transfer of prisoners. See Dissent at 1097
 
 
 [15]
 It should be noted that by requiring abstention we are not reintroducing an exhaustion requirement by another name. Exhaustion of state remedies is a mandatory, jurisdictional requirement that requires plaintiffs to attempt to vindicate their claim in state court before seeking federal jurisdiction over that same claim. Pullman abstention is not jurisdictional, but discretionary, and involves postponing adjudication of a federal claim pending resolution of a possibly determinative state law issue. We do not require plaintiffs to exhaust their equal protection claim; rather we ask that an unclear issue of state law be resolved by the state courts so as to avoid the necessity of addressing the equal protection question. See Askew v. Hargrave, 401 U.S. 476, 478, 91 S.Ct. 856, 857, 28 L.Ed.2d 196 (1971)
 
 
 [16]
 This is not to say that we are untroubled by the evidence of past inconsistent practices. We presume, however, that the defendant class will maintain, in subsequent state litigation, the interpretation of state law that they have advanced here, i.e., that Sec. 314 "applies no matter where the prisoner is located." See supra note 11
 The dissent suggests that we should not rely on the position of counsel for three hundred state judges, because six out of his three hundred clients stated at one point that they did not consent to his representation. Dissent at 1099 n. 5. These six defendants have offered no substitute counsel, however, and in the absence of any conflicting statement, we see no reason not to take counsel for the judges at his word. We draw further assurance from the fact that the state's highest law enforcement officer takes the same position. See supra note 11.
 
 
 [17]
 The dissent borrows from Alice in Wonderland to characterize this direct quotation from Justice Brennan and notes that Steffel involved Younger abstention rather than Pullman abstention. Dissent at 1100. The quoted language, however, applies equally to the Pullman context, as Justice Brennan's citation to Baggett v. Bullitt, 377 U.S. 360, 375-78, 84 S.Ct. 1316, 1324-26, 12 L.Ed.2d 377 (1964), as well as the cited discussion in Procunier, make clear. We recognize that the Court did not favor abstention in Steffel, Procunier, or Baggett, and the proposition is cited only to suggest that there is no simple "as applied" exception to Pullman abstention
 
 
 [18]
 The fact that Pennsylvania lacks a procedure by which federal courts can certify state law issues to the state courts is unfortunate; this is peculiarly the type of issue that could be resolved expeditiously by such a procedure. See Field, The Abstention Doctrine Today, 125 U.Pa.L.Rev. 590 (1977) (surveying the problems associated with abstention, and concluding that certification is a far better approach); see also Bellotti v. Baird, 428 U.S. 132, 150-51, 96 S.Ct. 2857, 2867-68, 49 L.Ed.2d 844 (1976)
 
 
 [19]
 Mandamus would not lie to control a sentencing judge's exercise of discretion regarding the outcome of a parole decision, but it does lie to compel performance of the mandatory duty of holding a hearing. See Bronson v. Commonwealth Board of Probation and Parole, 491 Pa. 549, 421 A.2d 1021, 1023 (1980); Commonwealth ex rel. Davis v. Pennsylvania Board of Parole, 484 Pa. 157, 398 A.2d 992, 993-94 (1979)
 
 
 [20]
 Plaintiffs finally suggest that effective relief in a state court action might be precluded by mootness, given their relatively short prison terms and the length of time necessary to obtain court review. Plaintiffs have demonstrated in this action, however, that any potential mootness problem can be avoided by a class action, in which incarcerated class representatives can be substituted when named plaintiffs are freed. See Pa.R.Civ.P. Rule 1701 et seq
 
 
 [21]
 In this regard, we note that under Pullman, the district court may not dismiss a federal action, but rather is to retain jurisdiction pending resolution of the state law issue. Plaintiffs may then protect their right to return to federal court for disposition of their federal claims, should that prove necessary, by reserving the federal claim and litigating only the state law issue in state court. See England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); Kovats v. Rutgers, 749 F.2d 1041 (3d Cir.1984)
 
 
 [22]
 Significantly, Frederick L. did not present an "orthodox" abstention situation; the immediate case does. The paradigmatic Pullman case is one where " 'a federal constitutional claim' is premised on an unclear state law issue." Frederick L., 557 F.2d at 383, (quoting Harris County Comm'rs Court v. Moore, 420 U.S. 77, 83, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975)). In Frederick L., we determined that "the alleged constitutional defects ... will exist, theoretically, regardless of the interpretation placed upon the state statutes or regulations." Id. at 383. The same cannot be said regarding Pennsylvania's parole system
 
 
 [23]
 It is possible that an action in the state court system after abstention will result in an early settlement or other resolution of this entire matter, given the fact that the parties' only real dispute appears to be over the propriety of federal intrusion
 
 
 [1]
 The full text of the title is:
 AN ACT To create a uniform and exclusive system for the administration of parole in this Commonwealth; establishing the "Pennsylvania Board of Parole"; conferring and defining its jurisdiction, duties, powers and functions, including the supervision of persons placed upon probation in certain designated cases; providing for the method of appointment of its members; regulating the appointment, removal and discharge of its officers, clerks, and employees; dividing the Commonwealth into administrative districts for purposes of parole; fixing the salaries of members of the board and of certain other officers and employees thereof; making violations of certain provisions of this act misdemeanors; providing penalties therefor; and for other cognate purposes, and making an appropriation.
 Act of August 6, 1941, No. 323, 1941 Pa.Laws 861.
 
 
 [2]
 In fact, the Act itself provides that parole from imprisonment for less than a maximum period of two years remains in the jurisdiction of the sentencing court, Pa.Stat.Ann. tit. 61, Sec. 331.26, where it had previously been placed
 
 
 [3]
 It should be noted that the district court did not find any ambiguity in the state law. To the contrary, in the course of denying defendants' motion to dismiss the court stated, "Sec. 314 is, by its own language, applicable only to convicts confined in county jails, houses of correction, or work houses." App. at 20
 
 
 [4]
 Even though the title may be considered in the construction of a statute, see Majority op. at 1090 n. 13, the Pennsylvania Supreme Court has noted that the title may not control and has construed this statutory provision to mean "that even in the case of ambiguity [the title] may be considered only to 'resolve the uncertainty' ", Commonwealth v. Magwood, 503 Pa. 169, 177, 469 A.2d 115, 119 (1983). That same Court earlier stated in State Highway Route No. 72, 265 Pa. 369, 374, 108 A. 820, 821 (1919), that "the title [of a statute] cannot give vitality to a subject omitted from the body of the act; for while a statute cannot be broader than its title, the title may be broader than the statute; if so, the latter must control."
 
 
 [5]
 Counsel's authority to speak for all the state judges may be questionable. Counsel is the counsel to the court administrator of Pennsylvania, and at least some of the judges, particularly the judges of the Court of Common Pleas of Bucks County, responded to the settlement notice saying, inter alia, "We do not consent to the representation of our interests in this matter by Howland W. Abramson, Esquire." App. at 59
 
 
 [6]
 In fact, one of the few secondary sources on Pennsylvania parole procedures states that petitioners seeking parole before sentencing judges have no right to a hearing. See 2 R. Wasserbly, Pennsylvania Criminal Practice Sec. 32.03 (1981)
 
 
 [7]
 Patently, abstention would not be required under the standards set forth in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), since there is no ongoing state action concerning important state interests in which the federal claims can be or have been presented. See Middlesex County Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423, 432-37, 102 S.Ct. 2515, 2521-24, 73 L.Ed.2d 116 (1982). Moreover, since there have already been class certification, a proposed Consent Decree, motions for summary judgment, and an appeal, this case is well beyond the "embryonic stage". Doran v. Salem Inn, Inc., 422 U.S. 922, 929, 95 S.Ct. 2561, 2566, 45 L.Ed.2d 648 (1975). Younger abstention is not warranted when the state proceeding commenced after "proceedings of substance on the merits have taken place in the federal court." Hicks v. Miranda, 422 U.S. 332, 349, 95 S.Ct. 2281, 2292, 45 L.Ed.2d 223 (1975)
 
 
 [8]
 Attributed to Gallileo upon being forced to recant his support of the view that the earth moves around the sun
 
 
 [9]
 In Commonwealth v. Isabell, 503 Pa. 2, 467 A.2d 1287 (1983), a prisoner was challenging the interpretation of his sentence as consecutive rather than concurrent. In Commonwealth v. Maute, 263 Pa.Super. 220, 397 A.2d 826 (1979), the prisoner was challenging his conviction and the conditions of his confinement